**ALANA L. MCMAINS**
California State Bar No. 285942
**MCMAINS LAW, APC**
185 West F St. #100-R
San Diego, California 92101
Telephone: (619) 310-5421
alana@mcmainslaw.com

Attorney for Plaintiff J.R.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R., an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; THAHESHA JUSINO; [FIRST NAME UNKNOWN] CASTON; [FIRST NAME UNKNOWN] PAPANDES; and DOES 1 through 10, inclusive;<br><br>Defendants. | Case No.:  4:26-cv-2290<br><br>**COMPLAINT FOR:**<br>  1. **Eighth Amendment Violation;**<br>  2. **Gender Violence;**<br>  3. **Sexual Battery;**<br>  4. **Intentional Infliction of Emotional Distress;**<br>  5. **Battery;**<br>  6. **Negligence;**<br>  7. **Bane Act;**<br>  8. **Trafficking Victims Protection Act; and**<br>  9. **California Trafficking Victims Protection Act**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This action stems out of Plaintiff J.R.'s repeated abuse—both sexual and physical—at the hands of those entrusted with her care when she was in custody at the Federal Correctional Institution Dublin ("FCI Dublin"), an all-female prison owned and operated by Defendant the UNITED STATES OF AMERICA ("the UNITED STATES") via its agency the Federal Bureau of Prisons ("BOP").

1

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

2. In October of 2022, Plaintiff was sentenced to approximately one year in custody for a nonviolent drug crime. When she reported to FCI Dublin to begin her incarceration in January of 2023, Plaintiff had no idea she was entering an environment so rampant with sexual abuse and corruption that guards and prisoners alike had nicknamed it "the rape club."

3. In approximately 2020, the Federal Bureau of Investigation ("FBI") began an investigation into the constitutional and human rights abuses at FCI Dublin. Since the inception of the investigation, nine correctional officers ("COs") working for the BOP at FCI Dublin have been convicted of crimes related to the sexual abuse of the female prisoners at the facility. The investigation is ongoing.

4. Defendant THAHESHA JUSINO ("JUSINO") became the warden at FCI Dublin after their prior warden, Ray J. Garcia, was arrested for sexual abuse of female inmates. Although JUSINO was tasked with reforming the toxic environment at FCI Dublin, she failed to take sufficient action to change the policies, practices, and cultures of the institution. Thus, sexual misconduct continued unabated under her watch.

5. Defendants [FIRST NAME UNKNOWN] CASTON ("CASTON") and [FIRST NAME UNKNOWN] PAPANDES ("PAPANDES") took advantage of their positions as COs at FCI Dublin to prey on the vulnerable, incarcerated women ostensibly under their care. These COs sexually assaulted and/or harassed Plaintiff in violation of federal and state law.

6. As a result of Defendants' actions, Plaintiff suffered numerous and substantial emotional, physical, and personal injuries that continue to affect her today, and likely will for the rest of her life.

**JURISDICTION AND VENUE**

7. Plaintiff's claims arise under the United States Constitution, the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), and California statutory and common law. The Court has federal question jurisdiction over Plaintiff's federal

claims, both constitutional and statutory, pursuant to 28 U.S.C. § 1331. Further, the Court has supplemental jurisdiction over Plaintiff's claims under California law pursuant to 28 U.S.C. § 1367 because these state-law claims arise from a common nucleus of operative fact with Plaintiff's federal claims.

8. This Court has personal jurisdiction over Defendants. Upon information and belief, all individual Defendants are citizens of, and domiciled in, California. The Court has specific jurisdiction over Defendants because they committed the actions and commissions forming the basis for each claim against them in California.

9. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b). As noted above, Defendants' actions and omissions that give rise to Plaintiff's claims occurred at FCI Dublin, located at 5701 8th St. in Dublin, California, which is within the Northern District of California.

## **PARTIES**

10. Plaintiff is an individual that is a citizen and domiciled in California. She was residing in California while incarcerated at FCI Dublin at all times relevant to this action. As a victim of sexual assault as defined by section 115.6 of the Prison Rape Elimination Act ("PREA"), she is using her initials to protect her privacy.

11. Upon information and belief, Defendant JUSINO is an individual that is a citizen of California. At all times relevant to this Complaint, she was employed by the BOP/UNITED STATES.

12. Defendant CASTON was an individual and citizen of California at all times relevant to this Complaint. Upon information and belief, he remains an employee of the BOP/UNITED STATES.

13. Defendant PAPANDES was an individual and citizen of California at all times relevant to this Complaint. Upon information and belief, he remains an employee of the BOP/UNITED STATES.

14.    Defendant United States of America ("the UNITED STATES") is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts of its employees and servants.

15.    The UNITED STATES owns, operates, managers, and oversees numerous prisons, including FCI Dublin.

16.    Defendant UNITED STATES, acting through its secretary, supervisory employees, employees, agents, and staffs, including those at the BOP, hired individual Defendants JUSINO, CASTON, PAPANDES, and DOES 1 through 10, inclusive, as employees.

17.    While performing the acts and omissions that Plaintiff alleges in this Complaint, JUSINO, CASTON, and PAPANDES were acting within the scope of their official employment and authority, whether actual or apparent.

18.    Plaintiff is ignorant as to the true names, identities, and capacities of Defendants DOES 1 through 10, inclusive.  Therefore, Plaintiff sues these Defendants via fictitious names.  When the true names, identities, or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will seek leave of this Court to amend the Complaint to assert their true names, identities, and capacities, as well as any specific relevant allegations.

19.    Upon information and belief, Defendant DOES 1 through 10, inclusive, were COs and/or employees of the UNITED STATES.  At all times relevant, these Defendants were acting within the scope of their official employment and authority, whether actual or apparent.

20.    Each DOE Defendant is responsible, in some manner, for the events and occurrences delineated in this Complaint, thereby legally causing the injuries and damages to Plaintiff as will be alleged.

21.    All Defendants were at all times responsive for the custody, care, control, direction, safety, and wellbeing of Plaintiff.

22.    Defendants, and at all times herein mentioned, each was acting within

4
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

the time, place and scope of employment of other Defendants. At all material times, all of the Defendants aided, abetted, authorized, and ratified all of the actions of all of the other Defendants. Plaintiff is informed and believes, and based thereupon alleges, that at all material times, Defendants, and each of them, were the agents, employees, managing agents, supervisors, coconspirators, parent corporation, joint employers, alter ego, and/or joint ventures of the other Defendants, and each of them, and in doing the things alleged herein, were acting within the course and scope of said agency, employment, conspiracy, joint employer, alter ego status, and/or joint venture and with the permission and consent of each of the other Defendants. Whenever and wherever reference is made in this Complaint to any act or failure to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly and severally.

## THE PRISON RAPE ELIMINATION ACT

23.    Recognizing the severe problem of rape and sexual assault within correctional institutions, Congress passed the PREA in 2003. *See* 34 U.S.C. § 30301, *et seq.*   The statute created the National Prison Rape Elimination Commission, which was tasked with establishing national standards for preventing and responding to sexual abuse of inmates.  These standards became effective in August of 2012 and were published in the Federal Register.

24.    PREA regulations are mandatory for all employees of the BOP.  The PREA required the BOP to create and maintain a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment outlining [the BOP's] approach to preventing, detecting, and responding to such conduct. Periodic audits of all federal correctional facilities is required in order to ensure compliance with the standards put forth in the regulations.

25.    The PREA requires that all staff "report immediately" and "knowledge, suspicion, or information regarding an incident of sexual abuse or

sexual harassment that occurred in the facility," as well as any "retaliation against inmates or staff who reported such an incident," as well as any "staff neglect or violation of responsibilities that may have contributed to an incident or regulation." 28 C.F.R. § 115.61. "Apart from reporting to designated supervisors or officials, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, as specified in agency policy, to make treatment, investigation, and other security and management decisions." *Id.* § 115.61(b).

26. It further mandates that prison officials assess whether a prison inmate is subject to a substantial risk of imminent sexual abuse, and if it is determined that the substantial risk exists, the prison must take immediate action to protect the inmate. *Id.* § 115.62.

27. Upon receiving a report of inmate sexual abuse, the facility is required to report it to a designated internal investigator and conduct an administrative or criminal investigation. *Id.* §§ 115.61(e); 115.222(a). A criminal investigation is required for all allegations of inmate sexual abuse, "unless the allegation does not involve potentially criminal behavior." *Id.* § 115.222(b). All such referrals must be documented. *Id.*

28. Given the high risk for retaliation against a reporter or victim, the BOP is required to "protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff and shall designate which staff members or departments are charged with monitoring retaliation." *Id.* § 115.67(a). A prison's PREA compliance manager must monitor an inmate sexual abuse victim for 90 days after a report of abuse is filed to ensure that he or she is not retaliated against by prison staff. *Id.* § 115.67(a); BOP Program Statement No 5324.11, at 44 (Jan. 6, 2014).

29. Pursuant to the PREA, all employees of the BOP that have contact with inmates must be trained on the following items: (1) zero-tolerance policy for

sexual abuse and sexual harassment; (2) responsibilities regarding detection, reporting, and responding to sexual abuse; (3) inmates' right to be free from sexual abuse and sexual harassment; (4) inmates' and employees' rights to be free from retaliation for reporting sexual abuse or harassment; (5) the dynamics of sexual abuse and sexual harassment in confinement; (6) the common reactions of sexual abuse/assault victims; (7) how to detect and respond to signs of threatened and actual sexual abuse; and (8) how to avoid inappropriate relationships or situations with inmates. *See* 28 C.F.R. § 115.31.

30.    The statute states that presumptive disciplinary sanction for staff that sexually abuses inmates is termination of employment; some form of discipline is required. *Id.* § 115.76.

31.    All documentation relating to an allegation of inmate sexual abuse must be maintained and securely retained for at least ten years after the date of initial collection. *Id.* §§ 115.87(a), (d); 115.89(a), (d).

32.    The PREA also requires the BOP to offer medical and mental health care to all sexual abuse victims.  *Id.* § 115.83.

### THE CULTURE OF SEXUAL ABUSE AT FCI Dublin

33.    Based on information and belief, throughout the last three decades, the UNITED STATES has repeatedly ignored incidents of sexual misconduct at FCI Dublin.

Despite the long-established requirements of the PREA, personnel at FCI Dublin engaged for years in a pattern and practice of engaging in sexual abuse of inmates and then covering it up.

34.    FCI Dublin had an institutional culture of defiance of the PREA.  COs regularly turned a blind eye towards rampant sexual assault and abuse of female inmates.  The culture prioritized loyalty to fellow COs over the duty under the PREA to prevent sexual assault and assist victims.  Inmates who spoke out were regularly retaliated against, also in violation of the PREA.

35. This culture was became entrenched during the period between December 2018 and November 2020, when Ray J. Garcia was the associate warden at FCI Dublin.

36. As the warden, Garcia was responsible for the safekeeping, care, protection, discipline, programming, health, employment, and release of inmates incarcerated at FCI Dublin. Garcia was also responsible for hiring, training, supervising, and managing staff. He had disciplinary authority over all employees working at FCI Dublin as well as all inmates incarcerated there. Garcia was further in charge of determining, enacting, and employing operating procedures and policies for FCI Dublin. Crucially, Garcia was in charge of ensuring PREA compliance and conducting the annual PREA audit.

37. Garcia failed to comply with the PREA throughout his tenure at FCI Dublin. He failed provide sufficient or effective training to the COs, staff, and independent contractors working with female inmates. He further failed to conduct adequate and accurate audits of the facility, because he was very aware that he himself, along with many others working at FCI Dublin, was personally engaging in sexual abuse of the incarcerated women. Garcia also, as part of his purposeful coverup of the epidemic of sexual abuse at the prison, failed to properly respond to or investigate complaints and/or allegations of sexual assault that he received as warden.

38. Garcia sexually assaulted multiple women under his care. He groped women, forced them to pose nude, and verbally degraded them. Garcia even continued to sexually harass women once they had been sent to BOP-controlled halfway houses, sending pictures of his penis to one. He intentionally used his power as warden to take advantage of his victims, promising them preferential treatment if they complied with his demands.

39. In September of 2021, Garcia was indicted for multiple counts of federal felony sexual abuse of a ward, based on sexually assaulting inmates and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

having naked photographs of inmates on his government-issued cell phone. He was convicted by a jury trial in March of 2023. When sentencing him to 70 months, the U.S. District Judge Yvonne Gonzalez Rogers declared that FCI Dublin was a "cesspool" and that Garcia not only "did nothing about it," but actually "went along with the ride and enjoyed the cesspool [him]self."

40.   Garcia's sexual misconduct was known to others at FCI Dublin, and it set an example that COs and other staff could get away with abusing the inmates. Garcia modeled poor behavior, and he intentionally ignored other employees' acts of sexual abuse that he either knew of or should have known about. Individuals working at FCI Dublin knew, through observing Garcia's conduct, that sexual abuse of women was acceptable and would not be punished. Thus, Garcia ratified the illegal conduct of his inferior officers.

41.   In addition to Garcia, least eight other BOP employees have been convicted of charges related to their sexual abuse of female inmates at FCI Dublin. While the investigation remains ongoing, the following individuals have been charged:

(a)   Andrew Jones pleaded guilty in August of 2023 and was sentenced to 96 months prison;

(b)   CO Ross Klinger pleaded guilty to sexual abuse of a ward in February of 2022 and was sentenced to time served;

(c)   Chaplain James Highhouse pleaded guilty in February of 2022 and was sentenced to 84 months custody;

(d)   CO Enrique Chavez pleaded guilty in October of 2022 and was sentenced to 20 months prison;

(e)   CO John Bellhouse was convicted by a jury in June of 2023 and sentenced to 63 months prison;

(f)   CO Nakie Nunley pleaded guilty in July of 2023 and was sentenced to 72 months prison;

(g)     CO Jeffrey Wilson pleaded guilty in August of 2025 and faces sentencing in March of 2026; and

(h)     CO Lawrence Gacad pleaded guilty in August of 2025 and was sentenced to 5 years probation.

42.     Upon information and belief, many more COs, staff, and contractors engaged in sexual abuse of women, even though they have not been indicted or convicted.

43.     Despite the FBI investigation and the removal of many COs accused of sexual abuse, predators remained at FCI Dublin. As a result of the many COs getting arrested, placed on leave, or transferred, the remaining COs were resentful and angry toward the women who they believed "snitched" on their coworkers.  The COs began engaging in retaliatory behavior against the women, including but not limited to locking women in the Special Housing Unit ("SHU") for solitary confinement, transferring them away from their families, giving them disciplinary "shots" that affected their good time credits, and conducting random, baseless searches during which they would violently tear up the women's property.

44.     JUSINO became the warden of FCI Dublin in February of 2022. JUSINO was aware of the breadth and severity of the misconduct at FCI Dublin. When speaking to the press at the beginning of her tenure, she stated, "It's horrible. It's absolutely horrible. I've never experienced anything like this. In my career, I've never been part of a situation like this. This is really unprecedented."[1]

45.     But despite JUSINO's professed goal of regaining the trust of inmates and the public, the status quo at FCI Dublin largely stayed the same. When the Director of the BOP visited the prison in March of 2022 to assess the situation, officials at FCI Dublin impeded the investigation and tried to make the prison look

---

[1] Michael R. Sisak and Michael Balsamo, *Abuse-clouded prison gets attention, but will things change?*, AP (May 4, 2022), https://apnews.com/article/business-prisons-california-sexual-abuse-only-on-ap-3a4db9ab478bfdd545ef3c7e08cd273b.

less troubled than it was.[2] Officials moved women out of the SHU so that it would not look as full, and they lied to the Director about Covid-19 contamination in order to prevent women from a certain unit from speaking with him.[3]

46. During the Director's visit, he noted multiple areas with insufficient security cameras. But JUSINO failed to promptly correct the problem.[4]

47. Retaliation against whistleblowing inmates and COs alike continued under JUSINO's regime. In May of 2022, a whistleblowing CO who had worked at FCI Dublin for 25 years was told she need to either accept a transfer across the country or lose her position.[5] Other whistleblowers were also reassigned to different prisons, ostensibly to prevent further speaking out.

48. As the scandal gained more media attention, U.S. Senate conducted a bipartisan investigation into sexual abuse of female prisoners in BOP custody. In December of 2022, the U.S. Senate Permanent Committee on Investigations, Committee on Homeland Security and Government Affairs released their final report.

49. The United States Senate's bipartisan investigation into sexual abuse of female prisoners in BOP custody found that BOP employees have sexually abused female prisoners in at least two-thirds of facilities that have held women over the last decade.[6] It additionally noted that BOP management failures and

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Lisa Fernandez, *Dublin prison guard says she was forced out for reporting abuse,* KTVU Fox 2 (Aug. 12, 2022), https://www.ktvu.com/news/dublin-prison-guard-says-she-was-forced-out-for-reporting-abuse

[6] U.S. Senate Permanent Subcommittee on Investigations, *Sexual Abuse of Female Inmates in Federal Prisons*, at 4 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf [hereinafter, Senate Report], at 1.

seriously flawed investigative practices are both to blame for this terrible failure to successfully implement PREA.[7]  The BOP also failed to hold employees accountable for their misconduct, with "a backlog of approximately 8,000 internal affairs cases alleging employee misconduct, some of which have been pending for more than five years."[8]

50.    The report also pointed out the inadequacy of the PREA audits in detecting or preventing sexual assaults of inmates.  It noted that FCI Dublin's PREA audits all came back clean, despite the known sexual misconduct that the guards were engaging in during that time period.  It asserted that FCI Dublin had a recurring problem of sexual abuse of female prisoners, and that there was evidence that problem had been ongoing since the 1990s.  It concluded that the BOP had failed to take agency-wide action to address the problem.

51.    In August of 2023, a class action lawsuit was filed against the BOP and FCI Dublin officials. *See California Coalition for Women's Prisoners et al. v. United States et al.*, No. 4:23-cv-4155-YGR (N.D. Cal.). A Special Master was appointed to oversee FCI Dublin.

52.    Shortly thereafter, in April of 2024, the BOP shut down FCI Dublin. *See id.* (ECF No. 300, at 1). Then-Director of the BOP Colette S. Peters acknowledged that the facility was "not meeting expected standards" despite the fact that the BOP had taken "unprecedented steps and provided a tremendous amount to address culture, recruitment and retention, aging infrastructure – and most critical – employee misconduct."[9]

53.    On June 5, 2024, the Special Master issued her first report regarding

---

[7] *Id.*

[8] *Id.* at 4.

[9] Lisa Fernandez, *FCI Dublin Closing, Women Transferred to Prisons Across U.S.*, KUTV (Apr. 16, 2024), https://www.ktvu.com/news/fci-dublin-closing-women-transferred-elsewhere.

FCI Dublin, finding that it had "a cascade of failure in critical institutional systems and areas."[10]  The report, among other things, highlighted the prison's significant problems with inadequate mental health treatment, discipline and due process, and inadequate PREA protocol.[11] The Special Master stated that it was "unconscionable that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin for such an extended period of time without correction."[12]

54.     The Special Master reviewed one PREA file that contained a document signed by JUSINO related to an inmate's abuse. The file appeared to be missing relevant documents; it also contained contradictory information regarding whether the file was actually sent to the Office of Internal Affairs ("OIA") or Office of Inspector General ("OIG"). Nothing in the file indicated that any FCI Dublin employee had followed up with the victim after the file was allegedly transferred to an outside agency.

55.     The Special Master also found substantial issues with understaffing that continued during JUSINO's tenure. This understaffing led to increased risk of sexual abuse of the inmates, as well as inadequate medical care.

## THE PHYSICAL AND SEXUAL ABUSE OF PLAINTIFF AT FCI DUBLIN BY CASTON AND PAPANDES

56.     Plaintiff was incarcerated at FCI Dublin between approximately January of 2023 and March of 2023. Due to her low-security risk and short sentence, she was designated to serve her time at Dublin's minimum-security camp.

57.     As soon as she arrived at FCI Dublin, Plaintiff realized the

---

[10] Wendy Still, First Report of the Special Master Pursuant to the Court's Order of March 26, 2024 (Jun. 5, 2024), at 28; https://s3.documentcloud.org/documents/25030691/fci-dublin-special-master-report.pdf

[11] *Id.*

[12] *Id.* at 13.

Case 4:26-cv-02290-YGR    Document 1    Filed 03/16/26    Page 14 of 33

environment was rife with cruelty, sexual misconduct, and corruption.

58.    Frequently, the COs would make sexual comments to women, inquiring and speculating about their sex lives, or assessing and praising their bodies.  COs would walk in on women while they were in the shower and leer at their naked bodies, just to show that they could.  COs would enter women's cells without any reasonable suspicion and conduct pat-downs and strip searches, under the pretext of a minor infraction.

59.    The COs were frequently degrading to the women, verbally abusing them.  It was not uncommon for the COs to fly into a fit of rage and destroy the women's property.

60.    Further, many of the COs had sexual contact with women at the prison. Plaintiff would see officers who repeatedly pulled the same woman out of her cell and took her to a private room. Inmates would openly discuss sexual and romantic relationships between the women and COs. They would also warn each other about which guards were particularly lecherous and abusive.

61.    Because these actions were well known to all the inmates at FCI Dublin, they lived in a daily atmosphere of fear. Though some women reported what happened, their complaints would be ignored. Other women did not even attempt to complain, as the COs had threatened them and warned them that nobody would believe the word of an inmate against a guard.

62.    On January 17, 2023, Plaintiff was attacked by a fellow inmate. This inmate believed Plaintiff might be a snitch due to Plaintiff being a newly incarcerated who had self-surrendered to the facility. Plaintiff tried to turn away because she did not want to fight, but several of the woman's friends joined in and continued to beat Plaintiff up.

63.    As a result of the fight, Plaintiff was put in a holding cell. She was told she was going to be moved from the minimum security camp to the SHU, which was more like solitary confinement.

14
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

64. CASTON was the CO who was supervising her in the holding cell. He immediately started sexually harassing Plaintiff.

65. While Plaintiff sat in the holding cell, she heard CASTON tell another officer, "Look at her big-ass titties."

66. Plaintiff was menstruating, and so she asked CASTON for a pad or tampon. CASTON refused to help. As Plaintiff started to bleed through her clothes, she began crying and again begged CASTON to provide her with some type of feminine hygiene product. CASTON called her a "bitch" and a "sissy" for crying, and then snapped that he did not care how much she bled on herself.

67. A female CO arrived an hour later and Plaintiff showed her the bloodstains. The COs all just continued to mock Plaintiff, laughing and telling her she was being a crybaby. Eventually, the female officer provided Plaintiff with new clothes and hygiene products.

68. CASTON was the CO assigned to escort Plaintiff from the holding cell to her cell in the SHU. When he went to handcuff her, he rubbed his penis on her backside and reached around and grabbed her breast.

69. Several days later, during count, CASTON ordered Plaintiff to get out of the shower. Plaintiff tried to ask if she could stay covered in the shower, waving her arm outside so that he would know she was there for the purposes of count. CASTON again ordered her to step out of the shower, laughing at her having to reveal her naked body to him.

70. On multiple occasions, CASTON demanded that Plaintiff show him her breasts or he would not bring her food. Plaintiff knew that this was not an idle threat, as CASTON regularly denied her basic necessities like food or clean clothing from the laundry.

71. CASTON grabbed Plaintiff's breasts at least two more times while she was in the SHU. Once, he reached and grabbed her crotch.

72. CASTON threatened Plaintiff and tried to deter her from reporting his

15

misconduct, stating he could keep her in prison past her sentence. He called her "a ghetto bitch that nobody would care about." He then said that he could get away with doing whatever he wanted, stating, "Bitch, we could lose you for three years and nobody would care."

73.    CASTON continued to harass Plaintiff during her time in the SHU. He repeatedly banged on her door when he worked the night shift, depriving her of sleep. He degraded her by denying her simple requests for pencils or ordering a female officer to "slap those cuffs on her," telling Plaintiff to "shut the fuck up" when she objected.

74.    CASTON threatened to interfere with Plaintiff's outgoing mail. When he took her mail, he would laugh at her and say in a mocking tone, "I hope they get out." Plaintiff attempted to send 12 letters from the SHU, and she knew that only a few actually were sent out of the prison.

75.    On multiple occasions, Plaintiff request psychiatric care or medical care from CASTON (including once when she fell off the top bunk and was injured). CASTON consistently refused to help, and Plaintiff would be forced to wait for a new CO to come on shift before she could make the request.

76.    Plaintiff was afraid to report CASTON for sexually assaulting her, because she knew that FCI Dublin staff would prevent people from reporting or retaliate when they did. Plaintiff also noticed that there were no signs or instructions regarding PREA rights or how to report PREA violations to FCI Dublin or to the OIG.

77.    Plaintiff was unsure what to do and was nervous about reporting internally at FCI Dublin. She eventually reported the comment about her breasts and the lack of menstrual products to the Special Investigation Supervisor ("SIS"). But she was too intimidated and afraid of retaliation to report that he had groped her and rubbed his penis on her.

78.    Shortly after she reported CASTON's verbal harassment and

inappropriate behavior to SIS, she was told that she was found the aggressor in her fight with the other women—despite the fact that they all had attacked her. This resulted in another 30 days in the SHU as well as a financial fine. Plaintiff suspected this was retaliation for speaking up about CASTON.

79. In early March of 2023, Plaintiff was set to meet with attorneys who were representing her in the class action lawsuit against FCI Dublin. CO PAPANDES was the CO in the SHU that day.

80. When PAPANDES first met Plaintiff, he leered at her breasts. He then declared, "What they said was right, they *are* big as fuck!"

81. CO PAPANDES took Plaintiff to the holding cell that was used as the "law library" in the SHU to wait for her appointment. PAPANDES was mocking her about missing her appointment, and he loudly discussed stripping her naked before the visit.

82. When it was time to escort her to the legal visit, PAPANDES entered her cell and violently grabbed her forearm and biceps. He squeezed her arm so hard that her forearm was bruised.

83. PAPANDES then put her in handcuffs and a "black box" handcuffs cover. The "black box" is an extra security device to make handcuffs even more secure. It was not routine to use them at FCI Dublin for moving inmates within the facility; Plaintiff had never had one used before until this legal visit.

84. PAPANDES secured the handcuffs and black box far more tightly than necessary. Plaintiff expressed that she was in severe pain; PAPANDES just sneered and told her to "man up." Plaintiff's hands eventually went numb.

85. When PAPANDES secured her ankle shackles extremely tightly, and she began to cry, he said, "Cry, bitch." Her achilles tendons bled from how tight the shackles were on.

86. Later, the Captain apologized to Plaintiff for how PAPANDES had treated her, acknowledging that he had been rough.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

87. As a result of PAPANDES's excessive force against Plaintiff, she still has scars on her wrists and back and a lump on her upper bicep area.

88. Days after Plaintiff's class action attorneys filed an emergency request for an administrative remedy on her behalf while she was in the SHU, and just one day before regional counsel's planned visit to FCI Dublin, Plaintiff was transferred to a new BOP facility.

89. Another woman held in the SHU told Plaintiff that she overheard COs talking about the transfer list. The woman heard a CO say that they needed to add Plaintiff to the list "because region's coming tomorrow."

90. It also became clear during the transfer that Plaintiff's transfer had been determined at the last-minute, because she was not on the official printed list. During the two-week transfer process, Plaintiff's name was always a "write-in."

91. Upon information and belief, JUSINO and the BOP decided to transfer Plaintiff as retaliation for participation in the class action and so that she could not speak with regional counsel.

92. BOP COs handling the transfer consistently treated Plaintiff poorly throughout the two weeks. She was again black-boxed for part of the time, further harming her wrists, and she was placed in a cage.

## FTCA ADMINISTRATIVE EXHAUSTION

93. This action is, at least in part, brought pursuant to the FTCA, which provides that a tort claim against the UNITED STATES will be forever barred "unless it is presented in writing to appropriate Federal agency within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

94. Plaintiff has administratively exhausted all her claims against the UNITED STATES as required by the FTCA.

95. Plaintiff submitted her "Claim for Damage, Injury, or Death" to the UNITED STATES on January 16, 2025. The Claim was in the amount of

$5,000,000.

96.    The BOP acknowledged receipt of Plaintiff's claims on January 23, 2025.

97.    Under the FTCA, if a federal agency fails to issue a final disposition on a claim within six months, a plaintiff may consider this a final denial of her claim. *Id.* § 2675(a).

98.    The BOP has neither accepted or denied Plaintiff's claim and over six months have passed.  Thus, Plaintiff considers this a final denial of her claim such that she may bring her claim in this Court.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**BIVENS CLAIM — VIOLATION OF THE EIGHTH AMENDMENT**

**CRUEL AND UNUSUAL PUNISHMENT**

**SEXUAL ABUSE, DELIBERATE INDIFFERENCE TO PLAINTIFF'S**

**SAFETY, AND FAILURE TO PROTECT**

**U.S. Const. Amdt. VIII**

**(Against Defendants JUSINO, CASTON, PAPANDES, and DOES 1–10, inclusive)**

99.    Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

100.    This constitutional claim is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

101.    The Eighth Amendment of the United States Constitution guarantees Plaintiff the right to be free from cruel and unusual punishment.  Sexual abuse of a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment, as it serves no legitimate penological purpose.

102.    Federal law recognizes that an inmate cannot legally consent to sexual contact, harassment, or abuse from a prison guard.  This is because the power

difference between inmates and guards is so extreme that it negates any ability to consent. Even sexual contact that would be considered consensual in other circumstances is not consensual in the context of an inmate. Plaintiff did not consent to any of the sexual contact or verbal harassment between her and CASTON or PAPANDES.

103. The actions of JUSINO, CASTON, and PAPANDES deprived Plaintiff of her Eighth Amendment rights.

104. The UNITED STATES failed to supervise and train FCI Dublin COs to prevent sexual abuse, despite being aware of the "rape club" culture at the prison. JUSINO and other supervisory employees ratified the conduct of CASTON, PAPANDES, and other COs engaged in sexual abuse of inmates by personally participating in the same conduct. The UNITED STATES also failed to comply with its duties under the PREA to help detect and prevent sexual abuse.

105. Defendants' actions and omissions created a substantial risk of serious harm to female inmates like Plaintiff. Due to their PREA training, Defendants were aware of that substantial risk, and yet they failed to take reasonable measures to abate the risk. In fact, they were deliberately indifferent to that risk by consciously choosing to disregard their duties under federal law.

106. JUSINO, CASTON, and PAPANDES violated Plaintiff's right to be free from cruel and unusual punishment when they made nonconsensual, offensive sexual contact with Plaintiff and/or engaged in sexual harassment for their own sexual gratification and for the purpose of humiliating, degrading, or demeaning Plaintiff. At the time, she was an incarcerated inmate at FCI Dublin and they were COs with substantial power over her, thus the sexual abuse occurred under coercive circumstances.

107. By intentionally subjecting Plaintiff to sexual assault and/or harassment, JUSINO, CASTON, and PAPANDES acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

108.    JUSINO, CASTON, and PAPANDES acted under color of federal law, in that they were acting or purporting to act in the performance of their official duties as BOP employees.

109.    Plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide a meaningful remedy; thus, an appropriate remedy, namely damages, can be imposed by this Court.

110.    As a direct and legal result of the aforementioned acts and omissions of the Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

111.    Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

112.    The conduct of JUSINO, CASTON, PAPANDES, and and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

## SECOND CAUSE OF ACTION

### GENDER VIOLENCE

### Cal. Civ. Code § 52.4

**(Against Defendant CASTON, PAPANDES and DOES 1–10, inclusive)**

113.    Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

114.    At all relevant times mentioned in this Complaint, California Civil Code § 52.4 was in full force and effect and was binding on CASTON and PAPANDES. Under that statute, any person subjected to gender violence may bring a civil action for damages against the responsible party. Gender violence is a form of sex discrimination that includes a physical intrusion or invasion of a sexual nature under coercive conditions.

115.    CASTON and PAPANDES committed a physical intrusion and/or

physical invasion of a sexual nature against Plaintiff under coercive conditions. Specifically, CASTON groped Plaintiff's breasts and crotch, rubbed his penis on her buttocks, and forced her to show him her naked body. PAPANDES sexually humiliated Plaintiff by discussing her breasts and threatening to strip her before using excessive force to shackle her.

116. CASTON and PAPANDES committed against Plaintiff a criminal offense that has an element of the use, attempted use, or threatened use of physical force against the person of another.

117. CASTON and PAPANDES committed these acts against Plaintiff at least in part because of her gender.

118. The acts of CASTON and PAPANDES were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

119. As a direct and legal result of the aforementioned acts and omissions of CASTON and PAPANDES, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

120. Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

121. The conduct of CASTON, PAPANDES, and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

122. Plaintiff further seeks attorneys' fees and costs, as expressly authorized by the statute.

//

//

//

**THIRD CAUSE OF ACTION**

**SEXUAL BATTERY**

**FTCA; Cal. Civ. Code § 1708.5**

**(Against the UNITED STATES, CASTON, and DOES 1-10, inclusive)**

123.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

124.   Plaintiff brings this claim for sexual assault under FTCA and California Civil Code § 1708.5 against the UNITED STATES and CASTON. The UNITED STATES ratified the conduct of CASTON. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant CASTON.

125.   CASTON acted with the intent to cause a harmful or offensive contact with Plaintiff; and a sexually offensive contact resulted.

126.   CASTON also acted with intent to cause an imminent apprehension of sexual assault and sexually offensive contact with Plaintiff resulted.

127.   CASTON's offensive contact would offend a reasonable sense of personal dignity and lacked any penological justification.

128.   CASTON's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

129.   As a direct and legal result of the aforementioned acts and omissions of CASTON, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other

23

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

economic and non-economic damages in an amount not yet ascertained.

130.  These allegations are also asserted against DOES 1–10, inclusive.

131.  The conduct of CASTON and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

132.  This action arises out of the commission of a felony.  Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### FTCA; California Common Law

### (Against All Defendants)

133.  Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

134.  Plaintiff brings this claim for intentional infliction of emotional distress under FTCA and California common law against the UNITED STATES and JUSINO, CASTON, and PAPANDES. The UNITED STATES ratified the conduct of JUSINO, CASTON, and PAPANDES. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants JUSINO, CASTON, and PAPANDES.

135.  JUSINO, CASTON, and PAPANDES engaged in willful misconduct that was outrageous and offensive.

136. JUSINO, CASTON, and PAPANDES intended to cause and/or acted with reckless disregard of causing severe emotional distress to Plaintiff.

137. As a direct and legal result of the aforementioned willful misconduct of JUSINO, CASTON, and PAPANDES, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

138. Plaintiff also brings this claim against DOES 1 through 10, inclusive.

139. The conduct of JUSINO, CASTON, and PAPANDES and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

140. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FIFTH CAUSE OF ACTION**

**BATTERY**

**FTCA; California Common Law**

**(Against Defendants the UNITED STATES, CASTON, PAPANDES, and DOES 1-10, inclusive)**

141. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

142. Plaintiff brings this claim for intentional infliction of emotional distress under FTCA and California common law against the UNITED STATES CASTON, and PAPANDES. The UNITED STATES ratified the conduct of CASTON and PAPANDES. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant CASTON and PAPANDES.

143.   CASTON and PAPANDES touched Plaintiff and/or caused Plaintiff to be touched with the intent to harm or offend her by sexually and/or physically abusing her while she was incarcerated at FCI Dublin.

144.   Plaintiff did not consent to the touching.  As an inmate at a correctional facility, she could not legally consent.  The touching had no legitimate penological purpose.

145.   Plaintiff was harmed and offended by the conduct of CASTON and PAPANDES, and a reasonable person in Plaintiff's situation would also have been offended by the touching.

146.   As a direct and legal result of the aforementioned acts and omissions of CASTON and PAPANDES, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

147.   Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

148.   The conduct of CASTON and PAPANDES and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

149.   This action arises out of the commission of a felony.  Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

//

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

### FTCA; California Common Law

### (Against All Defendants)

150.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

151.   Plaintiff brings this claim against the UNITED STATES, JUSINO, CASTON, PAPANDES, and DOES 1–10 under the FTCA and California common law based on the actions and/or omissions of UNITED STATES, JUSINO, CASTON, PAPANDES, and DOES 1–10 taken while working at FCI Dublin in their capacities as employees of the BOP and acting within the scope of their employment, with the permission and consent of the UNITED STATES.

152.   Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants JUSINO, CASTON, and PAPANDES.

153.   Because she was an inmate at a federal prison run by the BOP, Plaintiff was at all relevant times in the custody and care of the UNITED STATES.

154.   Because of the special relationship between a jailer and prisoner, the UNITED STATES, including its employees JUSINO, CASTON, PAPANDES, and DOES 1–10, inclusive, had a general duty and common law duty of care under California law to protect Plaintiff from foreseeable harm, including but not limited to sexual assault, harassment, and physical abuse.

155.   Sexual assault, harassment, and physical abuse of female inmate by

male COs was a foreseeable harm of which the UNITED STATES was aware. The BOP was specifically aware of the risk to female inmates based not only on the PREA, but on its knowledge of prior incidents of sexual assault of female inmates in the 1990s and 2000s. California negligence law does not require the UNITED STATES or JUSINO to have had actual knowledge of the abuse of Plaintiff by CASTON, PAPANDES, and ST. CLAIR, but nevertheless, the UNITED STATES and JUSINO knew or should have known of what CASTON and PAPANDES were doing because of the widespread prison rumors about them and multiple female inmates, as well as their flagrant behavior in making sexual comments to Plaintiff and visiting her cell without penological justification. The sexual abuse and harassment of Plaintiff by CASTON and PAPANDES was reasonably foreseeable to the UNITED STATES because their conduct made it obvious they were sexually abusing and/or harassing Plaintiff.

156. The BOP's Personal Conduct rules for staff disallow any sexual activity with an inmate and state that an employee may not allow another person to engage in such behavior. It explicitly states that there is no such thing as consensual sex between staff and inmates.

157. Further, Defendants had additional mandatory statutory duties of care to Plaintiff based on PREA regulations and BOP policy to protect Plaintiff from the known risk of sexual assault, harassment, and abuse. These duties required it to provide proper training and supervision of COs and to properly investigate allegations of sexual abuse.

158. The UNITED STATES and JUSINO breached these duties in a variety of ways. It failed to supervised and operated FCI Dublin in a manner that would have prevented the ongoing sexual/physical abuse and harassment of Plaintiff by CASTON and PAPANDES. The UNITED STATES and JUSINO did not take reasonable, available measures to abate the risk of abuse to Plaintiff and to guarantee her safety, even though a reasonable administrator would have complied

with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

159. The BOP as an agency, and JUSINO personally, failed to properly monitor, assess, and address its widespread problem with female inmates being sexual assaulted, especially at prisons with recurring issues like FCI Dublin. The BOP failed to sufficiently train supervisory FCI Dublin employees such as JUSINO who supervised CASTON and PAPANDES. It also lacked an effective system for checking to ensure the validity of PREA audits, instead allowing an abusive warden to falsify his report for multiple years, without any knowledge of the BOP. It further failed to provide sufficient security measures at FCI Dublin, including but not limited to adequate security camera coverage to eliminate unmonitored areas that provided a safe haven for perpetrators. The BOP also failed to take adequate steps to address complaints of misconduct, resulting in a backlog of thousands of complaints, and it failed to sufficiently analyze those complaints in order to detect patterns of misconduct by prisons or officers. It failed to properly screen potential employees, failing to research the backgrounds, histories, qualifications, and competence of COs that were hired. And the BOP further failed to properly discipline and terminate COs who engaged in misconduct and retaliation against those who spoke out against misconduct. Instead, it made reckless and dangerous decisions to transfer those COs to a new unit or even new prison—thus giving them the opportunity to find a new set of victims.

160. The sexual and/or physical abuse and harassment of Plaintiff by CASTON and PAPANDES occurred as the direct and proximate result of the supervisory negligence of the UNITED STATES and JUSINO and DOES 1–10.

161. As a direct and legal result of the aforementioned negligence of the UNITED STATES, JUSINO, CASTON, and PAPANDES, and DOES 1–10, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other

economic and non-economic damages in an amount not yet ascertained.

### SEVENTH CAUSE OF ACTION

### BANE ACT

### FTCA; Cal. Civ. Code § 52.1

### (Against All Defendants)

162. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

163. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants JUSINO, CASTON, PAPANDES, and ST. CLAIR.

164. Under Cal. Civil Code §52.1, it is a civil rights violation for any person to interfere with the exercise or enjoyment by an individual of her rights secured by the U.S. Constitution or state or federal law. This includes any interference with these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

165. JUSINO, CASTON, and PAPANDES interfered with Plaintiff's rights to protection from bodily restraint, harm, and insult, as secured by California Civil Code § 43; her rights under the California Constitution to be free of the imposition of punishment without due process, cruel and unusual punishment, and the right to be free from sexual violation; and her right under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment; her rights under California and federal law and the First Amendment to engage in free speech and report sexual harassment without retaliation. Defendants interfered with these

rights by threat, intimidation, and/or coercion.

166.   Plaintiff also brings this claim against DOES 1–10, inclusive.

167.   As a direct and legal result of the aforementioned conduct of JUSINO, CASTON, and PAPANDES, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

168.   Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 52.1.

## EIGHTH CAUSE OF ACTION

### TRAFFICKING VICTIMS PROTECTION ACT

### 18 U.S.C. § 1581, *et seq.*

### (Against Defendants the UNITED STATES, CASTON, and DOES 1 – 10, inclusive)

169.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

170.   Defendant CASTON knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her and other women.

171.   Defendant CASTON sexually abused Plaintiff through force and/or coercion.

172.   Plaintiff also brings this claim against DOES 1–10, inclusive.

173.   As a direct and legal result of the aforementioned acts and omissions of Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained. She thus has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. §

1595.

## NINTH CLAIM FOR RELIEF

### CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT

### FTCA; Cal. Civ. Code § 52.5

174. (Against Defendants the UNITED STATES, CASTON, and DOES 1 – 10, inclusive)

175. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

176. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant CASTON.

177. Defendant CASTON knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her.

178. Defendant CASTON sexually abused Plaintiff through force and/or coercion.

179. Plaintiff also brings this claim against DOES 1–10, inclusive.

180. As a direct and legal result of the aforementioned acts and omissions of Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

### PRAYER FOR RELIEF

Plaintiff J.R. prays for judgment as follows:

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1) For compensatory, general, and special damages, including past, present, and future damages, in an amount in accordance to proof;

2) For punitive damages as permitted by law;

3) For reasonable costs, attorneys' fees, and litigation expenses, including expert witness fees, as permitted by law; and

4) For any other relief that is just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

Date: March 16, 2026

/s/ *Alana L. McMains*
**Alana L. McMains**
**MCMAINS LAW, APC**
Attorney for Plaintiff